IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                  Plaintiff,                    No. 03:14-cr-00100-HZ-12

     v.

RUBIO GUALBERTO TZIU-UC,             OPINION & ORDER

                  Defendant.

Billy J. Williams
ACTING UNITED STATES ATTORNEY
District of Oregon
Geoffrey A. Barrow
ASSISTANT UNITED STATES ATTORNEY
Pamala R. Holsinger
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

      Attorneys for Plaintiff

/ / /

/ / /

1 - OPINION & ORDER

Todd Bofferding
Attorney at Law
P.O. Box 539
Hood River, Oregon 97013

      Attorney for Defendant[1]

HERNANDEZ, District Judge:

      Defendant Rubio Gualberto Tzui-Uc moves to suppress evidence seized in two separate searches. He also moves to exclude his identification by a confidential source (CS). An evidentiary hearing was conducted on July 8, 2015. For the reasons discussed below, I deny the motions.

BACKGROUND

      On March 6, 2014, the grand jury returned an indictment charging Defendant, along with several co-defendants, with conspiracy to distribute and possess with intent to distribute, heroin, methamphetamine, and cocaine, and to use communication facilities in furtherance of drug trafficking, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 843(b), 846, 952, and 960. Trial is set for August 17, 2015.

      As part of its investigation into the drug distribution conspiracy, law enforcement agents used a CS to engage in a controlled buy of cocaine from Defendant. They then obtained a search warrant for a storage unit where they found and seized approximately three pounds of methamphetamine. Several months later, shortly after the grand jury returned the indictment, law

---

[1] During the filing of the motions and through part of the evidentiary hearing held on the motions, Defendant represented himself with Mr. Bofferding as stand-by counsel. During the hearing, Defendant requested that Mr. Bofferding be appointed as his counsel. I granted the motion and reappointed Mr. Bofferding as Defendant's counsel. See ECF 532 (Minute Order of July 8, 2015 Hearing).

2 - OPINION & ORDER

enforcement agents obtained a search warrant for Defendant's residence where they found and seized small quantities of marijuana, methamphetamine, and cocaine, as well as cell phones, financial records, a drug ledger, and a digital scale. More detailed facts relevant to the specific issues raised by the motions are noted below.

DISCUSSION

I. Summary of the Motions

Both Defendant himself, and Mr. Bofferding at Defendant's request, filed motions to suppress. Defendant also filed a supplemental memorandum in support of the motions. Together, the motions and the supplemental memorandum raise the following issues: (1) whether recordings by the CS are admissible; (2) whether showing the CS an Oregon Department of Motor Vehicles (DMV) driver's license photograph of Defendant was unduly suggestive; (3) whether the search of the storage unit was supported by probable cause; (4) whether the affidavit in support of the search warrant of Defendant's home contained stale information; (5) whether the affidavit in support of the search warrant of Defendant's home described the residence with particularity; and (6) whether Defendant is entitled to a Franks hearing.

II. Request for a Franks Hearing

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing where he can attack the veracity of a search warrant affidavit or challenge the omission of material facts in the affidavit. When a defendant seeks a Franks hearing because of

> allegations of material false statements or omissions in an affidavit supporting a
> search warrant, a defendant must make a substantial preliminary showing that
> false or misleading statements were (1) deliberately or recklessly included in an

affidavit submitted in support of a search warrant; and (2) necessary to the finding
of probable cause.

United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011) (internal quotation marks omitted).

More specifically, five requirements must be satisfied before a defendant is entitled to a

hearing under Franks:

> (1) the defendant must allege specifically which portions of the warrant affidavit
> are claimed to be false; (2) the defendant must contend that the false statements or
> omissions were deliberately or recklessly made; (3) a detailed offer of proof,
> including affidavits, must accompany the allegations; (4) the veracity of only the
> affiant must be challenged; and (5) the challenged statements must be necessary to
> find probable cause.

United States v. Perdomo, 800 F.2d 916, 920 (9th Cir. 1986) (internal quotation marks omitted);

see also United States v. Craighead, 539 F.3d 1073, 1080 (9th Cir. 2008) (to "justify a Franks

hearing, a defendant must make specific allegations, allege a deliberate false statement or

reckless disregard for the truth, and support the claim with a detailed offer of proof"); United

States v. Ruddell, 71 F.3d 331, 334 (9th Cir. 1995) (the "lack of an affidavit or sworn statement

offering proof of deliberate falsehood . . . is enough in itself to defeat [a] demand for an

evidentiary hearing.").

Defendant's supplemental memorandum requesting a Franks hearing fails to identify

which statements in which search warrant affidavit he contends are false or misleading and fails

to identify any material omissions.   In a reply memorandum filed July 7, 2015, he cites to

approximately twenty-four allegedly false statements and notes two alleged omissions.

Although the reply memorandum attempts to cure the deficiencies in Defendant's initial

supplemental memorandum, it fails to do so and fails to support Defendant's request for a Franks

hearing.  First, the reply memorandum cites to the Government's response, ECF 508, to

4 - OPINION & ORDER

Defendant's motions and not to any actual statements made in either of the search warrant affidavits. While this may be a shortcut method of citing to the warrant affidavits, in many cases the citation to the page and line in the Government's response is not, in fact, to a quote from an affidavit. For example, Defendant cites to page 4, lines 4 and 5 of the Government's response, challenging the statement that the "CS told law enforcement that a Hispanic male known as 'Rubio' worked for [co-defendant] Orozco-Lopez as a drug courier." Def.'s Reply at 2. But, this statement in the Government's response is provided as factual background and is not represented to be a statement made by the search warrant affiant.[2] Although the Government later notes that Drug Enforcement Administration (DEA) Special Agent Morgan Matthies presented "the above facts" in an affidavit in support of the search of the storage unit, Defendant's citation to a background passage in the Government's response memorandum is not a sufficiently specific challenge to a statement in a warrant affidavit.

Second, even if the citations to the Government's response are sufficient, Defendant's reply memorandum is unsupported by an affidavit or declaration of Defendant stating that the statements are false or misleading. Thus, he fails to meet the requirement of providing a detailed offer of proof. Third, the vast majority of Defendant's challenges are not to statements made by the <u>affiants</u>. His challenges are predominantly to what the CS knew or said or what Orozco-

---

[2] All citations by Defendant to statements appearing on pages 4-8 of the Government's response suffer from the same problem. Additionally, other citations are to argument, not to statements appearing in search warrant affidavits. For example, Defendant challenges the statement at page 19, lines 18-19 of the Government's response that "[e]ven though no longer working for Orozco-Lopez, defendant continued in the business of distributing methamphetamine." Def.'s Reply at 7. This statement appears in a paragraph arguing that the affidavit supporting the search warrant for Defendant's residence did not contain stale information. It is not a quote from the search warrant affidavit.

Lopez said.  Accordingly, he fails to challenge the veracity of the affiants.  The request for a

Franks hearing is denied.

III.  Recorded Phone Calls & Body Wire

At the evidentiary hearing, Matthies testified that the investigation into the drug

distribution conspiracy began when the CS provided information to law enforcement that

Orozco-Lopez was distributing methamphetamine and cocaine.  As part of that investigation,

agents set up a controlled buy for the CS to purchase one ounce of cocaine from Orozco-Lopez,

allegedly as a sample for a later purchase of six kilograms of cocaine.  The process of arranging

the controlled buy included phone calls between the CS and Orozco-Lopez.  The CS consented to

the recording of those calls.  Additionally, the CS consented to wearing a body wire during the

July 24, 2013 drug-purchase transaction between the CS and Defendant.

In his motion, Defendant argues that his voice and statements were unlawfully seized by

the CS when phone calls were recorded and when the CS wore a body wire.  At the evidentiary

hearing, it became clear that Defendant does not challenge the CS's consent to the phone or body

wire recordings.  Instead, Defendant disagrees with the Government on the law, suggesting that

unless the recorded person invites the person doing the recording onto the property of the

recorded person, unilateral consent of the person doing the recording is insufficient.

I disagree with Defendant.  Although I invited Defendant to provide the Court with

citations to his authority, he has now informed the Court, through Mr. Bofferding, that he

declines to do so.  As the Government states, the law on this issue is well-settled.  Under federal

constitutional and statutory law, no warrant is necessary to surreptitiously record a conversation

as long as one of the two parties to the conversation consents to the recording.  United States v.

White, 401 U.S. 745, 748-54 (1971); Armstrong v. Asselin, 734 F.3d 984, 989 (9th Cir. 2013). Additionally, 18 U.S.C. § 2511(2)(c) provides that it is not unlawful for a "person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." Matthies's testimony establishes that the CS was working on behalf of law enforcement. There is no dispute that the CS consented to the recordings. No warrant was required. The motion to suppress the recordings made by the CS is denied.

IV.  Identification of Defendant

Defendant moves to suppress the CS's pretrial identification of Defendant and to exclude his identification by the CS at trial. The Due Process Clause protects against suggestive photographic identification procedures that create a substantial likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 198 (1972); Simmons v. United States, 390 U.S. 377, 384 (1968); see also United States v. Carr, 761 F.3d 1068, 1073 (9th Cir. 2014) (photographic identification procedures which are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" are unconstitutional) (internal quotation marks omitted), cert. denied, 135 S. Ct. 1722 (2015). Additionally, "[s]uggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law." United States v. Bagley, 772 F.2d 482, 492 (9th Cir. 1985). To determine whether a photographic identification is constitutionally permissible, the court must consider the totality of the circumstances. Carr, 761 F.3d at 1074

Matthies testified that the CS who provided information to law enforcement about Orozco-Lopez's drug distribution activities knew Orozco-Lopez through an auto body repair

business.  In his interactions with Orozco-Lopez at the auto body repair shop before the July 24, 2013 controlled buy, the CS also encountered Defendant.  Then, when Orozco-Lopez and the CS spoke on July 23, 2013, Orozco-Lopez said that "Rubio" was "running errands in Sherwood" and could not meet the CS at that time.  Matthies explained that based on his training and experience in supervising a number of controlled buys and investigating drug trafficking organizations, he understood the reference to "running errands" to mean that "Rubio" was delivering drugs to people in Sherwood.  Because law enforcement did not want to wait for "Rubio" to return to Portland, they put off the buy until the next day, July 24, 2013.

Matthies testified that before the controlled buy occurred the following day, the CS contacted law enforcement and reported that "Rubio," whom the CS identified as Orozco-Lopez's courier, had appeared at the CS's house the previous evening with the one-ounce sample of cocaine to complete the transaction.  The CS put "Rubio" off until the next day, telling "Rubio" he did not want to hold the drugs overnight and he did not have the cash with him for the purchase.  The CS also told Matthies that "Rubio" gave the CS his phone number of 971-212-1528.

With the phone number, law enforcement was able to do a couple of things.  First, they ran the number through a law enforcement database.  Second, they connected the number through a subpoena to a Sprint phone.  Third, they examined Orozco-Lopez's phone records, which law enforcement already possessed, and learned that the 971 number that "Rubio" provided to the CS was in frequent contact with Orozco-Lopez.  The database check revealed that the phone number was associated with a Rubio Tzui-Uc and had been listed as a contact number on a wire transfer.

Now possessed with a complete name, law enforcement was able to search through other

databases.  They found an Oregon driver's license for an individual with that name, and also found that the individual had a prior cocaine arrest.  Law enforcement then obtained a DMV photo of this person.  The DMV photo was of Defendant.

The CS met with law enforcement the morning of July 24, 2013, before the controlled buy.  Agents showed the CS the DMV photo at that meeting.  The CS confirmed that the person in the photo was the person he knew from the auto body repair shop and who had showed up at his house the previous evening.

Law enforcement then proceeded with the controlled buy.  Through a number of phone calls with Orozco-Lopez, the purchase for the one ounce of cocaine was arranged.  Matthies testified that Orozco-Lopez advised the CS that Rubio, his courier, would be delivering the cocaine.  The CS was to meet Rubio at Ed Benedict Park in Southeast Portland.  Approximately six agents surveilled the transaction.  They observed the CS waiting in the park.  Defendant arrived driving a green Acura.  The CS got in the car, stayed for three or four minutes, then left the car.  Defendant drove away, but was followed by law enforcement to a house on Southeast Main Street and then to the Money Saver Mini-Storage, a location already known to the law enforcement team based on data obtained from Orozco-Lopez's phone.  Law enforcement then followed Defendant to his residence on Southeast Bush Street.

Law enforcement obtained records from the Money Saver Mini-Storage which confirmed that the storage unit was leased to Defendant at his address on Southeast Bush Street.  The lease information also showed the same 971 phone number that Defendant had provided to the CS the previous night.

The fundamental problem with Defendant's identification argument is that the CS's

9 - OPINION & ORDER

identification was not based on the single DMV photo.  <u>Before</u> being shown the photo, the CS

already knew "Rubio" to be Orozco-Lopez's associate and was familiar with him from the auto

body repair shop.  Orozco-Lopez had referred to "Rubio" by that name in at least one phone

conversation.  The night before the controlled buy, again <u>before</u> being shown the DMV photo,

Defendant went to the CS's house to sell him the sample of cocaine.  He gave the CS his phone

number which law enforcement then used to identify "Rubio" as Defendant.  This was confirmed

by the fact that the phone number provided to the CS was in frequent contact with Orozco-Lopez

and had been listed as the contact number of "Rubio Tziu-Uc" on a wire transfer.  Law

enforcement independently confirmed that Defendant had been previously arrested on a drug

charge.  Only then did law enforcement obtain the DMV photo and only then did they show it to

the CS.  Moreover, law enforcement agents personally observed the controlled buy and watched

Defendant travel to the storage unit and then to his apartment.

 I agree with the Government that under the totality of the circumstances, the showing of

the DMV photo of Defendant to the CS was not unduly suggestive and did not create a

substantial likelihood of misidentification.  The CS already knew "Rubio."  The agents identified

Defendant by connecting pieces of information obtained after they received his phone number

and accessed law enforcement databases.  They then observed Defendant during the controlled

buy and followed him to the storage unit and his home.  The motion to suppress the pretrial

identification of Defendant as well as any in-court identification, is denied.

V.  Challenges to Search Warrant Affidavits

 Defendant moves to suppress evidence obtained in searches of the storage unit at the

Money Saver Mini-Storage and of his residence.  Analysis of the motion requires an examination

of the search warrant affidavits which were received at the evidentiary hearing as Government Exhibits 1 and 2.

"To be valid, a search warrant must be supported by an affidavit establishing probable cause." Cameron v. Craig, 713 F.3d 1012, 1018 (9th Cir. 2013) (internal quotation marks omitted). "Probable cause exists where, under the totality of the circumstances, a reasonable officer has occasion to believe that the search will uncover evidence relating to a suspected crime." Id.; see also United States v. Fries, 781 F.3d 1137, 1150 (9th Cir. 2015) ("Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances.") (internal quotation marks omitted), petition for cert. filed, ___ U.S.L.W. ___(U.S. June 26, 2015) (No. 14-10447).

The probable cause standard requires only a "fair probability" that contraband or evidence is located in a particular place. United States v. Kelley, 482 F.3d 1047, 1050 (9th Cir. 2007) (citing Illinois v. Gates, 462 U.S. 213, 246 (1983); United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)). "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question." Id. (internal quotation marks omitted). "Neither certainty nor a preponderance of the evidence is required." Id.

Additionally, a reviewing court may not "flyspeck the affidavit through de novo review," and must give "great deference" to the issuing judge's decision. Gourde, 440 F.3d at 1060; see also United States v. Crews, 502 F.3d 1130, 1135 (9th Cir. 2007) ("A magistrate judge's finding of probable cause is entitled to great deference"). The "'resolution of doubtful or marginal cases' . . . 'should largely be determined by the preference accorded to warrants.'" Kelley, 482 F.3d at

11 - OPINION & ORDER

1050-51 (quoting <u>Gates</u>, 462 U.S. at 237 n.10).  The issuing magistrate "may rely on the training and experience of affiant police officers."  <u>United States v. Chavez-Miranda</u>, 306 F.3d 973, 978 (9th Cir. 2002); <u>see also United States v. Fannin</u>, 817 F.2d 1379, 1382 (9th Cir. 1987) (issuing magistrate may rely on conclusions of experienced officers regarding where evidence of a crime is likely to be found).

A.  Storage Unit Search

In support of the storage unit search warrant, Matthies submitted a fifteen-page affidavit to Magistrate Judge Papak.  Govt's Ex. 1.  Matthies initially provided information about his background with the DEA and his prior law enforcement work in Los Angeles.  <u>Id.</u> at 1.  He recited his previous involvement with drug trafficking investigations and offered information about the habits of drug traffickers using stash locations, including storage units, to conceal their controlled substances.  <u>Id.</u> at 1, 4-5.

Several pages of the affidavit recite the details of the investigation.  <u>Id.</u> at 6-12.  In an overview of the investigation, Matthies noted that Orozco-Lopez was the leader of a drug trafficking cell which was importing large quantities of cocaine and methamphetamine into Oregon for distribution throughout the Northwest and elsewhere.  <u>Id.</u> at ¶ 8.  He identified Defendant as a drug courier employed by Orozco-Lopez and stated his belief that Unit C-58 at the Money Saver Mini-Storage at 7702 SE 92nd Avenue in Portland was used by Orozco-Lopez and Defendant to store and conceal their drugs.  <u>Id.</u>

Next, he reviewed the information provided by the CS and described the controlled buy. <u>Id.</u> at 6-12.  Matthies noted that precision location information on Orozco-Lopez's cell phone revealed that the phone was at the storage unit location at 7702 SW 92nd Avenue in Portland on

12 - OPINION & ORDER

July 19, 2013.  Id. at ¶ 13.  In describing the controlled buy, Matthies reported that Defendant's

cell phone number was in frequent contact with Orozco-Lopez's phone.  Id. at ¶¶ 18-19.  He also

stated that after the completion of the controlled buy, law enforcement officers followed

Defendant from the park to an address at 8606 SE Main where Defendant remained for

approximately five minutes, then to the storage unit location where he was observed at Unit C-

58, and finally to 12010 SE Bush Street in Portland where he used a key to enter Apartment D.

Id. at ¶¶ 22-25.  While observing him at the storage unit, law enforcement officers noted that

Defendant tested the lock to make sure it was secure as he closed the unit.  Id. at ¶ 24.  Matthies

stated that the lease records provided by Money Saver Mini-Storage showed Defendant as the

renter with an address of 12010 SE Bush Street #D and with the phone number of 971-212-1528.

Id.

Matthies explained in the affidavit that based on the investigation, the controlled buy, and

his training and experience, he believed the storage unit location was being used to conceal and

store drugs and drug proceeds.  Id. at ¶ 26.  He believed Orozco-Lopez was an "upper echelon"

drug trafficker and that Defendant was his courier.  Id.  He believed that Defendant delivered the

one ounce of cocaine to the CS, then made another delivery at 8606 SE Main, then drove to the

storage location so he could replace unsold drugs and deposit the drug proceeds from the two

sales.  Id.  Matthies noted that drug dealers will go to their stash locations directly after drug

transactions so they can deposit the recently earned drug proceeds, replace any used drugs and

evaluate their stock.  Id.  He further explained that drug dealers often use storage units because

they are protected, away from their residences, and offer a certain degree of "plausible

deniability" if discovered.      Id.

13 - OPINION & ORDER

Based on the information in the affidavit, Judge Papak correctly concluded that there was a fair probability that contraband or evidence of drug trafficking would be found in Unit C-58 at the Money Saver Mini-Storage.  Defendant suggests that probable cause is lacking because law enforcement did not observe Defendant at the storage unit before the controlled buy.  Defendant's argument overlooks that Defendant went to the CS's apartment the night of July 23, 2013 to sell the CS the one-ounce sample of cocaine and that the sale was not consummated at that time.  Thus, it is reasonably plausible that Defendant retained possession of the cocaine overnight.  There was no need for him to stop at the storage unit on his way to the controlled buy.  Then, having sold the cocaine to the CS and perhaps conducting another sale at the SE Main Street address, it is reasonable to assume that Defendant would go to the storage unit to drop off unsold drugs, to replenish his supply for another sale, or to store the cash obtained from the sale.  Combined with the information that Orozco-Lopez's phone had been at the storage unit location only a few days earlier, along with the other information about the drug trafficking Orozco-Lopez was involved in, the affidavit provided more than sufficient information to conclude that there was a fair probability the storage unit contained contraband or evidence of a drug trafficking crime.  I deny the motion to suppress the evidence obtained as a result of the search of the storage unit.

B.  Search of the Residence

On March 11, 2014, Magistrate Judge Acosta authorized a search warrant for Defendant's residence at 12010 SE Bush Street, Apt. D, in Portland, along with twelve other locations associated with Orozco-Lopez's drug trafficking organization.  Govt's Ex. 2.  The warrant application was supported by an affidavit executed by Special Agent Robert Priddy, an agent

with the Department of Homeland Security.  Id.  Defendant contends that the search warrant affidavit lacked probable cause because it relied on stale information and failed to describe the residence with sufficient particularity.

    1.  Staleness of Information

Generally, "[a]n affidavit must be based on facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." United States v. Lacy, 119 F.3d 742, 745 (9th Cir. 1997) (internal quotation marks omitted).   However, "the mere lapse of substantial amounts of time is not controlling in a question of staleness." Id. (internal quotation marks and brackets omitted).  Staleness is evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought." United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir. 1993) (internal quotation marks omitted).  Information provided in support of a search warrant "is not stale if there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." United States v. Schesso, 730 F.3d 1040, 1047 (9th Cir. 2013) (internal quotation marks omitted).

In the search warrant affidavit, Priddy outlined his experience in narcotics, and other, investigations. Govt's Ex. 2 at 1-2.  Specific details about each place targeted in the search were provided in attachments to the affidavit.  Id. at Attachs. A-1 to A-13.  In the body of the affidavit itself, Priddy described the 12010 SE Bush Street, Apt. D address as Defendant's primary residence.  Id. at ¶ 5.  He noted that Defendant was a Portland drug distributor and former associate of Orozco-Lopez.  Id.  Priddy also noted that utility records revealed that the current subscriber for power was Hong N.B Le with a co-applicant listed as Juan B. Tziu-Uc.  Id.  A court-ordered Global Positioning System (GPS) mobile tracking device on Defendant's vehicle

routinely placed his vehicle at the residence overnight in August 2013.  Id.  On July 24, 2013, the

day of the controlled buy, investigators observed Defendant using to a key to enter the apartment.

Id.  On February 14, 2014, another law enforcement officer observed a gold Mitsubishi Montero,

bearing Oregon license plate 518 GLX, parked in front of the Bush Street apartment.  Id.  A short

time later, the officer observed Defendant departing the parking lot of the Bush Street apartment.

Id.

       Priddy provided an overview of the investigation of Orozco-Lopez.  Id. at 10-12.  He

noted that in early March 2014, Defendant, along with several others, had been indicted on drug

conspiracy charges.  Id. at 12.  Several pages of the affidavit gave information about the July 24,

2013 controlled buy of the one-ounce sample of cocaine by the CS from Defendant and the

subsequent search of the storage unit.  Id. at 14-16.  Priddy noted that after the controlled buy,

law enforcement followed Defendant to the Main Street address, to the storage unit, and finally

to the Bush Street apartment.  Id. at 5-16.

       According to Priddy's affidavit, after the seizure of methamphetamine from the storage

unit, investigators intercepted calls between Orozco-Lopez and his Mexican source of supply,

Oracio Felix-Zazueta, regarding the seizure of the drugs from the storage unit.  Id. at 16.  In those

calls, Orozco-Lopez explained that he believed that Defendant had stolen the seized

methamphetamine.  Id.  Priddy further stated that in February 2014, about one month before

Priddy executed the affidavit in support of the search warrant of the Bush Street residence, he

"learned" that Portland Police drug and vice officers "received information that [Defendant] is

still distributing methamphetamine."  Id.  Priddy stated that he believed that Defendant was likely

being supplied methamphetamine by another unknown source but had continued his drug

16 - OPINION & ORDER

distribution activity after the storage unit seizure and falling out with Orozco-Lopez's organization.  Id.

Priddy also included information in his affidavit about drug trafficking generally.  Id. at 37-41.  He noted that drug traffickers use mobile electronic devices, including cell phones, to maintain their illegal trafficking business and that such equipment often contains evidence of their illegal activities.  Id. at 39.  He specifically noted that drug traffickers maintain drug-trafficking records in their residences and businesses.  Id. at 38-40.  They will oftentimes "front" controlled substances to their clients, or alternatively, will be "fronted" these items from their supplies.  Id. at 39-40.  "Pay and owe" records are kept to show balances due and payments expected.  Id.  According to Priddy, these records are commonly kept for "an extended period of time."  Id. at 39-40.

Defendant argues that the search warrant affidavit for his residence lacked probable cause because the facts particular to him were stale.  He contends that the information about him was limited to events that occurred seven and one-half months before the warrant affidavit and that the continuing investigation did not involve him or his residence.  He also argues that none of the information linked any criminal transactions or misconduct to his residence.  He maintains that his residence was "dumped" into a search warrant request directed at a over one dozen properties.

The Government concedes that Defendant's involvement with Orozco-Lopez's organization likely ended sometime shortly after the seizure of methamphetamine from the storage unit in July 2013.  But, the Government contends that the warrant affidavit and caselaw support a determination of probable cause based on the "extended period" of time that records of drug-trafficking activity are typically held by organization members.  The Government also relies

17 - OPINION & ORDER

on the statements by Priddy that shortly before he executed the warrant affidavit, he was told by

Portland police that Defendant was still distributing methamphetamine.  This, according to the

Government, establishes continuing illegal activity by Defendant, even though unrelated to

Orozco-Lopez's organization.

To the extent Defendant argues that aside from the staleness issue (and the particularity

issue discussed below), probable cause was lacking, I reject the argument.  The affidavit more

than sufficiently creates a fair probability that contraband or evidence would be at Defendant's

residence.  Priddy's experience with drug trafficking organizations and investigations establishes

that a wide-range of evidence, from cell phones to contraband to records, is often found at a

subject's residence.  Thus, to the extent Defendant generally challenges the nexus between the

illegal activity and his residence, his challenge is without merit.  United States v. Angulo-Lopez,

791 F.3d 1394, 1399 (9th Cir. 1986) (in drug trafficking cases, it is reasonable to assume that

evidence will be found where dealers and their associates live).

The staleness issue is a much closer question, however.  I reject the Government's attempt

to "freshen" the evidence from July 2013 with evidence that Defendant was still distributing

illegal drugs in February 2014.  The only statement in support of this assertion is Priddy's report

that Portland police "received" information that Defendant was still distributing

methamphetamine.  As I stated on the record at the evidentiary hearing, this is nothing more than

"gossip."

Although an affidavit supporting a search warrant may be based upon hearsay, Jones v.

United States, 362 U.S. 257, 269 (1960), overruled on other grounds, United States v. Salvucci,

448 U.S. 83 (1980), rumor is not enough to establish probable cause. United States v. Lopez, 482

F.3d 1067, 1072 (9th Cir. 2007). Priddy's affidavit fails to demonstrate why the information received by Portland police regarding Defendant's continuing methamphetamine distribution activity is reliable. The affidavit is silent as to what information Portland police actually received, from whom, or when. It lacks a factual basis upon which to determine that the source of the information was reliable enough to show that Defendant was currently engaging in illegal drug dealing. Therefore, Priddy's reference to Defendant's drug dealing in February 2014 does not assist the Government in its attempt to show illegal activity contemporaneous with the search warrant affidavit.

As the Government notes, however, with criminal activity that may reasonably be expected to continue for long periods of time, and especially in drug trafficking cases, greater lapses of time are tolerated. In such cases, "probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity." Angulo-Lopez, 791 F.3d at 1399; see also United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information on marijuana growing operation not stale; greater lapses of time permitted if the evidence sought is of an ongoing crime). As the Ninth Circuit stated in a 2004 case, "in cases involving ongoing narcotics businesses, lapses of several months—and up to two years in certain circumstances—are not sufficient to render the information in an affidavit too stale to support probable cause." United States v. Fernandez, 388 F.3d 1199, 1254 (9th Cir. 2004); see also Greany, 929 F.2d at 535 ("When the evidence sought is of an ongoing criminal business of a necessarily long-term nature, such as marijuana growing, rather than that of a completed act, greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time").

19 - OPINION & ORDER

While the law supports the proposition that probable cause in drug trafficking cases may extend for months or years, these cases are distinguishable. None of them address a situation concerning the search of a residence of a <u>former</u> member of an ongoing drug trafficking organization. When the criminal activity is ongoing, it is reasonable to assume that evidence of that activity, including records maintained by drug traffickers, may be kept for "some period of time," or as Priddy states, an "extended period of time."

Here, the question is whether Judge Acosta could reasonably conclude that there was a "fair probability" that records of Defendant's drug distribution activity from late July 2013 would be in Defendant's home in early March 2014 even though Defendant was no longer involved with Orozco-Lopez's organization. This, as indicated above, is a "commonsense, practical question" requiring "[n]either certainty nor a preponderance of the evidence[.]" <u>Kelley</u>, 482 F.3d at 1050. While, as noted above, this is a close question, I am guided by the "great deference" I must give to the magistrate judge's decision and by the preference given to warrants in "marginal" cases. <u>Id.</u> at 1050-51. With such deference, I conclude that the information regarding Defendant's activities in July 2013 was not impermissibly stale. The affidavit reasonably suggested that Orozco-Lopez's organization was extensive and that Defendant had played a regular courier role. There was nothing to suggest that Defendant had any incentive to destroy any records or other evidence. The lapse of time does not itself create an inference that the records would no longer be there. Thus, while many months old, the events of July 2013 established a "fair probability" that illegal items or evidence of illegal activity would still be in Defendant's apartment several months later. The information was not impermissibly stale and it provided a basis for the magistrate judge's probable cause determination.

20 - OPINION & ORDER

2. Particularity of Description

Attachment A-5 to the search warrant described Defendant's residence as follows:

**Subject Residence: 12010 SE Bush Street, Apartment D, Portland, OR 97266 and all vehicles located on the premises.**

A two story multi-family apartment residence, tan in color with white trim. 12010 SE Bush Street #D sits on the south side of SE Bush Street between SE 119th Avenue and SE 122nd Avenue. 12010 SE Bush Street #D is located on the ground floor in the northeast corner of the <u>second building</u> south of the gated entrance on the east side of the apartment complex parking lot. The gold numbers 1-2-0-1-0 are displayed vertically on white trim facing west, on the north end of the building. The white front door to 12010 SE Bush Street #D faces west and is located in an interior hallway through a glass door facing north at the north end of the building. The gold letter "D" is displayed to the left of the front door on a tan background. The residence 12010 SE Bush Street #D is located in the City of Portland, County of Multnomah, State of Oregon.

Attach. A-5 to Govt's Ex. 2 (emphasis added).  The attachment also had a photograph of the

apartment building with an arrow pointing to Apartment D and stating "Unit D in hallway." <u>Id.</u>

Defendant argues that the search warrant attachment failed to accurately describe the

residence to be searched because it identified the building as the "<u>second</u> building south of the

gated entrance" (emphasis added), when Defendant's residence is located in the <u>third</u> building.

He contends that evidence seized during the search must be suppressed because the warrant

lacked sufficient particularity in describing his residence.

The Fourth Amendment requires a warrant to particularly describe the place to be

searched.  U.S. Const. amend. IV.  As to descriptions of places, "[i]t is enough if the description

is such that the officer with a search warrant can, with reasonable effort ascertain and identify the

place intended."  <u>Steele v. United States</u>, 267 U.S. 498, 503 (1925).   In the Ninth Circuit, the

validity of a warrant is determined by "(1) whether the warrant describes the place to be searched

with sufficient particularity to enable law enforcement officers to locate and identify the premises with reasonable effort, and (2) whether any reasonable probability exists that the officers may mistakenly search another premise." United States v. Brobst, 558 F.3d 982, 992 (9th Cir. 2009) (internal quotation marks and brackets omitted).  In analyzing the effect of a misstated address on the adequacy of a warrant, the "necessary specificity of the description . . . depends heavily upon the factual circumstances of each case." Id.  (internal quotation marks omitted).

The description of the residence was sufficient.  The description was quite detailed, including the location of the particular apartment within the unit as being in the northeast corner of the building, the vertical display of the building numbers 12010 on the north end of the building, the placement of the letter "D," the precise location of the front door, the color of the front door, and a description of an interior hallway through a glass door.  Importantly, while there were multiple buildings in the apartment complex, only one bore the number 12010.  With that number, the correct location is easily identified, regardless of whether it was the second or third building from the gate.  Additionally, the photograph in Attachment A-5 was current and accurate.   Because the detailed description was accurate in every respect except the reference to the building as the second as opposed to the third building south of the gated entrance, because the building number was unique to the correct building, and because the photograph was current and accurate, the warrant described the apartment with sufficient particularity to allow law enforcement officers to locate and identify the correct premises with reasonable effort.  There is no reasonable probability that the officers could have mistakenly searched the wrong residence.

The motion to suppress the evidence seized as a result of the search of Defendant's residence is denied.

22 - OPINION & ORDER

CONCLUSION

Defendant's motions to suppress [433, 470] are denied.

IT IS SO ORDERED.

Dated this _16_ day of _July_, 2015

Marco A. Hernandez
United States District Judge